## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JEVIC HOLDING CORP., et al., | Case No. 08-11006 (BLS) |
| Debtors | Jointly Administered |

### DECLARATION OF DAVID H. GORMAN IN SUPPORT
### OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, DAVID H. GORMAN, do hereby declare, under penalty of perjury, that:

1.     I am the President and Chief Executive Officer ("CEO") of Jevic Holding Corporation ("JTX") and Jevic Transportation, Inc. ("Jevic"). I am the President of Jevic Transportation, Inc., the sole member of Creek Road Properties, LLC ("Creek Road"). I have held the position of President and CEO of Jevic since August 2005. Previously, I was the Senior Vice President of Operations for Jevic. I have detailed knowledge of and experience with the business and financial affairs of the Debtors.

2.     I have been involved in the Debtors' restructuring efforts and the wind-down of the Debtors' business, including consulting on a regular basis with the Debtors' officers and executives, members of the Debtors' Board of Directors or their equivalent and managing professionals engaged by the Debtors with respect to the foregoing.

3.     On May 20, 2008 (the "Petition Date"), the Debtors each filed voluntary petitions (the "Petitions") for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in an effort to preserve and maximize the value of their Chapter 11 estates. This Declaration is submitted in support of the Debtors voluntary petitions and the First Day Pleadings.

4.     The Debtors intend to continue to manage the wind-down process to deliver all freight in their system and to manage their properties as debtors-in-possession under the Bankruptcy Code.

5.     I have been advised by counsel that this Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334. In addition, I have also been advised by counsel that venue of these cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     No request has been made for the appointment of a trustee or examiner, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession under the Bankruptcy Code. As of the date hereof, no Official Committee of Unsecured Creditors has been appointed in the Debtors' Chapter 11 cases.

A.     **Overview of the Debtors' Corporate Structure and Business**

7.     The Debtors are comprised of three entities, Jevic Holding Corp. ("JTX"), Jevic Transportation, Inc. ("Jevic"), and Creek Road Properties, LLC ("Creek Road"). All of the operations of the Debtors occur through Jevic. Creek Road holds no assets and has no operations. JTX holds 100% of the issued and outstanding stock of Jevic and has no independent operations.

8.     Jevic is a hybrid less-than-truckload ("LTL") and truckload ("TL") carrier providing regional and inter-regional time definite delivery across the United States and parts of Canada. Jevic's operating model eliminates many of the multiple transfers and interim handling of other freight carriers resulting in higher service quality and lower freight claims with less capital investment than traditional hub-and-spoke networks.

9.     Jevic also operates a separate operating division, Jevic Transportation Services ("JTS"). JTS provides a wide variety of non-asset based freight brokerage services to a diverse customer base. JTS is primarily focused on truckload freight, which is responsible for 80% of its

-2-

revenue, but also provides a variety of services including LTL, rail, air, and expedited transport. JTS utilizes a network of over 700 carriers and a non-proprietary transportation management system. JTS generated approximately five percent of Jevic's revenue.

10.     Jevic began operations in 1981 utilizing a unique LTL/TL operating model. Jevic had an initial public offering in 1997 and was acquired by Yellow Corporation in 1999. In 2002, Yellow spun off Jevic and its sister company, Saia Motor Freight Line to form SCS Transportation.

11.     In January of 2006, SCS Transportation announced it was evaluating strategic alternatives including the sale of Jevic. As a result of this announcement, customers were uncertain about the future of Jevic and revenue significantly decreased in the first half of 2006. In June 2006, Sun Transportation, LLC ("STL"), which is owned by Sun Capital Partners, IV, LP ("Sun"), acquired Jevic. STL continues to own substantially all of the stock of JTX, the parent of the other Debtors.

12.     Jevic employed approximately 1,785 employees, none of which were subject to a collective bargaining agreement. In 2007, the driver force had a 27% turnover rate, which is significantly lower than the industry average of 120%. Prior to the Petition Date, the Debtors terminated approximately 90 percent of their employees.

13.     The Debtors served over 3,500 customers across a diverse range of industries. The customer base was significantly diversified. As of December 31, 2007, Jevic's top 10, 25 and 50 customers accounted for 14.5%, 25.2% and 34.5% of revenue respectively. Jevic established itself as a highly reliable carrier, with a specialty in the area of chemicals requiring freeze protection. Approximately 40% of Jevic's revenue resulted from chemical and chemical related sectors.

DEL1 68359-1

14. Jevic is headquartered in Delanco, NJ and has its largest terminal on the premises. The Debtors also operated nine additional terminals and one remote sales office throughout the United States. All of the Debtors' facilities are leased. Prior to the Petition Date, the Debtors were in the process of consolidating their operations and closing four of their terminals including locations in Charlotte, North Carolina, Atlanta Georgia, Cincinnati, Ohio, and Memphis Tennessee.

B.     **The Debtors' Debt Structure**

15. On July 28, 2006, the Company entered into an aggregate $101.2 million secured credit agreement (as amended, the "Prepetition Facility") with CIT as agent and certain other lenders and lienholder parties thereto (the "Prepetition Lender"). The Prepetition Facility consisted of a $85 million revolving facility and a $16.2 million term loan. Subsequent to a sale and lease-back of the Debtors' facilities, the revolving facility was reduced to $60 million and the term loan was eliminated. The Prepetition Facility is secured by eligible accounts receivable as well as rolling stock. The Prepetition Facility bears an interest rate tied to either LIBOR or prime, at the Debtors' option, plus a spread. At December 31, 2007, the Debtors had $25.4 million of borrowings and $27.8 million of letters of credit outstanding under the revolving facility. The remaining minimum availability was $4.8 million, which was below the minimum availability covenant of $5.0 million.

16. Under the Prepetition Facility the Debtors were required to maintain a minimum fixed charge coverage ratio at the end of each quarter for the most recent twelve months. The Debtors defaulted on this fixed charge coverage ratio as of September 30, 2007 and December 31, 2007. Under the terms of the Prepetition Facility, the default on this covenant could allow the Prepetition Lender to accelerate or require immediate payment of the entire Prepetition Facility.

-4-

17.     The Debtors entered into a forbearance agreement with the Prepetition Lenders on January 8, 2008, which was set to expire on February 28, 2008. In connection with the forbearance agreement Sun provided a $2 million limited guaranty of the Prepetition Facility. The forbearance agreement with the Prepetition Lender has been amended a number of times to extend the expiration date. However, the forbearance agreement expired without extension on May 12, 2008.

## C.     Events Leading to the Bankruptcy Filing

18.     The Debtors' revenue began to suffer a significant reduction in the fourth quarter of 2006 due to a variety of factors including the decline in the housing market, the tightening of the credit markets, and the slowdown in the automotive industry, which have led to a nationwide decline in freight volumes. Jevic's revenue declined by 8.4% in 2006.

19.     In 2007, Jevic instituted a number of initiatives focused on improving operating efficiencies and decreasing fixed costs through eliminating redundant headcount, streamlining processes, and realigning its operating network. The Debtors realized approximately $19 million of annualized fixed cost reductions, however, the freight volume slowdown that began in 2006 continued and freight revenue decreased 7.7% in 2007. Additionally, the Debtors' EBITDAR was negatively impacted by the record escalation of fuel costs. As a result of these items, as more fully discussed above, the Debtors first began to default on their covenants in their Prepetition Facility at the end of September 2007.

20.     The Debtors continued to implement profitability improvement initiatives in 2008. These initiatives included increasing business with its most profitable customers, eliminating unattractive freight, increasing fuel surcharges, and enhancing process efficiency. The Debtors believed that these initiatives would increase their EBITDAR by over $8 million in

2008. The Debtors also attempted to increase their EBITDAR by closing four terminals to geographically restructure their operations.

21.     Although the Debtors continued to aggressively pursue costs savings and revenue generating initiatives, the reduction in freight volume, record fuel costs and tightening credit markets prevented them from escaping their defaults on the Prepetition Facility and have increased the Debtors' liquidity problems and led to the commencement of these cases.

22.     Prior to commencing these cases, the Debtors initiated an orderly wind-down process. As a part of the wind-down process, the Debtors have ceased substantially all of their business and terminated approximately 90 percent of their employees. The Debtors continue to manage the wind-down process in attempt to deliver all of the freight that is in their system and to retrieve their assets.

D.     **First Day Motions**

23.     I reviewed each of the First Day Pleadings and participated in the preparation thereof. I believe that, to the best of my knowledge, the facts set forth in the voluntary petitions and the First Day Pleadings are true and correct. This representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. Based upon the foregoing, if called to testify, I could and would, testify competently to the facts set forth in each of the First Day Pleadings.

24.     The relief sought in the First Day Pleadings will minimize the adverse impact of these cases on the Debtors and will maximize value for the Debtors' creditors. I believe that the relief sought in the First Day Pleadings is necessary to enable the Debtors to manage and effective wind-down of their business as debtors-in-possession.

DEL1 68359-1

25.     As described more fully below, the Debtors carefully tailored the relief requested in the First Day Pleadings in consultation with their professionals to ensure that the Debtors' immediate operational needs are met and that the Debtors will not suffer any immediate and irreparable harm. I participated in the analysis that led to the creation of each of the First Day Pleadings.

### a.     Motion for Joint Administration

26.     The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Chapter 11 cases will jointly affect all three of the Debtors. For this reason, the Debtors believe that the interests of the Debtors, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 cases. The Debtors further believe that in order to optimally and economically administer the Debtors' pending Chapter 11 cases, such cases should be jointly administered, for procedural purposes only, under the case number assigned to Jevic. The Debtors believe that joint administration will also significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. Moreover, the Debtors believe that the relief requested by this motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee. For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

### b.     Motion to Employ and Retain Claims, Noticing and Balloting Agent

27.     The Debtors seek authority to retain and employ Epiq Bankruptcy Solutions, LLC ("Epiq") as their claims, noticing and balloting agent (the "Agent"). Upon information and

belief, Epiq is an experienced Agent and is frequently used in Chapter 11 cases. I believe that Epiq is well qualified to serve as Agent in these cases and their employment will provide the Debtors with efficient management of the claims, noticing and balloting processes in these cases leaving the Debtors' management and professionals to focus on the Debtors' reorganization efforts.

### c.  Cash Management Motion

28.  The Debtors seek entry of an order of the Court (a) authorizing and approving the continued use of their existing Cash Management System.[1], (b) authorizing the continued use of their existing bank accounts and business forms, and (c) authorizing their deposit practices and modifying the requirements of Section 345(b) in connection therewith on an interim basis.

29.  As of the Petition Date, the Debtors maintained the following bank accounts (the "Bank Accounts") with various banks (the "Cash Management Banks"):[2]

(a)  Depository Accounts: The Debtors maintain two lockbox accounts for the collection of the majority of funds generated through operations. These lockboxes are swept into two depository accounts (the "Depository Accounts"). The Depository Accounts are maintained at JPMorgan Chase Bank and bear the account numbers XXXXX5074 and XXXXX5108. The cash in the Depository Accounts is swept daily by the Debtors' prepetition lenders ("CIT" or the "Prepetition Lenders").

(b)  Master Account: The Debtors maintain a master account (the "Master Account") at JPMorgan Chase Bank bearing the account number XXXX9999. The Master Account is funded daily by CIT. Funds flow out of the Master Account to the Disbursement Account (as defined below), the Funding Accounts (as defined below), and to vendors via ACH transfer.

(c)  Disbursement Account: The Debtors maintain a disbursement account (the "Disbursement Account") at JPMorgan Chase Bank bearing account number XXX8317. The Disbursement Account is utilized to fund all

---

[2] A list of the Bank Accounts is annexed to the proposed order as Exhibit A. A chart depicting the Debtors' Cash Management System is annexed to the proposed order as Exhibit B

accounts payable payments to vendors that are needed by check, with the exception of payments required by JTS, which are described below and non-vendor payments as described below. The Disbursement Account is funded daily as needed from the Master Account. Borrowing from CIT is managed to minimize the remaining balance in the Disbursement Account.

30. The Debtors' Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity. Businesses use such systems because of the numerous benefits provided, including, without limitation, the ability to: (a) quickly create status reports on the location and amount of funds, which allows management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds. Granting the Debtors the authority to continue using the Cash Management System will help facilitate a smooth transition into the chapter 11 cases.

31. In the ordinary course of business, the Debtors use numerous varieties of business forms. To minimize expenses to their estates and avoid confusion on the part of employees, customers and suppliers, the Debtors respectfully request that the Court authorize the Debtors to continue to use all correspondence and business forms (including, without limitation, checks, letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date without reference to the Debtors' status as debtors in possession, provided however, that upon depletion of the Debtors' check stock, the Debtors will obtain new check stock reflecting their status as debtors in possession. With such authorization, the Debtors will be able to avoid the expense and delay of ordering entirely new business forms.

### d. Employee Wages/Benefits Motion

32. Pursuant to the Employee Wage Motion, the Debtors are seeking authority to honor and pay all pre-petition employee wages, salaries, and other accrued compensation.

33.     The Debtors are in the process of an orderly wind-down of their operations and are in the process of reducing their entire workforce. Recently, the Debtors employed approximately 1,785 employees (the "Employees"). However, prior to the Petition Date, the Debtors terminated approximately 90 percent of their employees and began the process of closing their businesses. However, in the ordinary course of their businesses prior to the Petition Date, the Debtors incurred payroll obligations to its employees for the performance of their services.

34.     The Debtors also participated in or were obligated under various salary and wage policies, savings plans, insurance plans and other programs designed to provide benefits for their Employees. As more fully set forth below, many of such plans were terminated prepetition.

35.     As of the Petition Date, the Employees had earned or accrued in their favor various prepetition wages for (i) wages, salaries, and vacation pay, (ii) employee business expenses, including, without limitation, expenses for travel, meals and lodging, and (iii) other employee benefits, including, without limitation, those due to or for the benefit of Employees under various health, life and savings plans and vacation plans (the "Prepetition Wages"). The Prepetition Wages are due and owing to the Debtor's Employees as of the Petition Date by reason of, *inter alia*:

(a)     the filing of the chapter 11 petition in the middle of the Debtor' s regular and customary payroll period, as well as in the middle of the Debtor's regular reimbursement cycle for Employee business expenses;

(b)     the possible failure of payroll and expense reimbursement checks issued to Employees prior to the commencement of this case to have been presented or to have cleared the banking systems as of the Petition Date;

(c)     the fact that Employees have not yet been paid all of their salaries and wages earned for services previously rendered to the Debtor or have not been reimbursed for business expenses previously paid by such Employees on behalf of the Debtor; and/or

-10-

(d)    the fact that certain Employee benefits related to prepetition services have not yet been paid or advanced to or for the benefit of the Employees.

36.    The Debtors' salaried and hourly Employees are paid on a Sunday through Saturday week with payroll checks and direct deposits being issued the following Thursday. The Debtors' total weekly payroll obligations, prior to terminating substantially all of the workforce, were approximately $2 million.

37.    The Employees also accrue vacation days throughout the year. The Employees' accrued vacation days are reset to zero on January 1st, regardless of the amount of vacation taken during the prior year. In the overwhelming majority of the jurisdictions in which the Debtors operated, vacation pay was treated as wages under state law. As of the Petition Date, many of the employees are owed pay for accrued but unused vacation time. As of the Petition Date, none of the Debtors' Employees are owed in excess of the $10,950 statutory cap set forth in Bankruptcy Code section 507(a)(4) when considering both wages and accrued but unused vacation time.

38.    The Debtors deduct certain amounts from their employees' paychecks for the employee portion of health and welfare insurance premiums, 401(k) deductions, and other miscellaneous amounts (collectively, the "Employee Deductions"). The Employee Deductions comprise property of the Debtors' employees and average approximately $275,000 per week. The Employee Deductions are withheld and either forwarded to appropriate third-party recipients at varying times or withheld by the Debtors in the case of certain self-insured plans. The Debtors seek the authority to forward the Employee Deductions to the appropriate third parties as they become due, and in the case of the self-insured plans, to apply such withheld amounts to obligations incurred by the employees. Even if the Court were not inclined to grant the relief

-11-

requested herein, the individual employees may be able to assert rights to such funds under the theory that they are held by the Debtors in trust for the appropriate recipients.

39.     The Debtors customarily reimburse their Employees who incur a variety of business expenses in the ordinary course of performing their duties on behalf of the Debtors (the "Business Expenses"). At the time of the cessation of the Debtors businesses, many of the Employees were in the processes of delivering freight and returning trucks to the Debtors' facilities. These actions, which are continuing, reduced the liabilities of the Debtors and reduced the risk of loss of the Debtors' equipment, thereby preserving the value of the Debtors' estates. If the relief requested herein is not granted, the Employees will suffer great hardship and, in many instances, financial difficulties, since those monies are needed to enable the Employees to meet their own personal obligations. Moreover, the Employees likely incurred such expenses without the understanding that they were advancing credit to the Debtors. If the payments are not made, the Debtors believe that a number of the Employees that remain will leave for other employment and impair the Debtors' efforts to maximize the value of their assets. Therefore, it is in the best interests of the estates and all parties in interest for the Court to authorize such payments.

40.     The Debtors sponsored many health and benefit programs for the Employees. As indicated below, a substantial portion of the programs were self-insured and were terminated prepetition. The major benefit programs are as follows:

(a)     **Medical Insurance** - The Debtor provided medical insurance coverage administered through United Health Care. The medical plan was self-insured and was terminated prepetition. The Debtors absorbed the majority of the costs under the Plan, but approximately 35 percent of the cost was deducted from Employees as a part of their weekly payroll deductions. The Debtors thus have deducted certain fund from the Employees to cover claims that have not been paid.

-12-

(b)  **Dental Insurance** - The Debtors provided dental insurance coverage through MetLife. Hourly employees were eligible for this insurance the first month following 90 days of service; salaried employees are eligible as of the date of hire. The dental plan was terminated prepetition. The Debtors paid all of the premiums for the dental insurance.

(c)  **Vision** - The Debtors provided Vision coverage through AIG EyeMed Vision Care. The premiums were paid by the employees through weekly payroll deductions. The vision plan was terminated prepetition. The Debtors thus hold certain funds deducted from Employees for vision care.

(d)  **Life Insurance and Accidental Death and Disability** - The Debtors provided $50,000 of group life insurance through Lafayette Life and $50,000 of accidental death and disability ("AD&D") coverage through AIG. Employees could purchase optional term life insurance, additional AD&D coverage, whole life insurance, and critical illness insurance at their own cost. The basic plans were terminated prepetition. The Debtors thus may hold certain funds deducted from Employees for the optional life insurance and accidental death and disability.

(e)  **Short Term Disability** - The short term disability is mandatory for employees based in New Jersey and California. The tea m drivers are domiciled in New Jersey and are therefore must be enrolled in this program. Coverage is optional for all other employees. This program is administered by Lafayette Life. The premiums are paid through weekly payroll deductions.

(f)  **Employee Assistance Program** - The Debtors offered an employee assistance program administered by United Behavioral Services. This program is funded by the Debtors and was terminated prepetition.

(g)  **401k Savings Plan** - Employees were eligible for the Debtor's 401(k) after six months of service and could join the first of the month following employee's eligibility. This program is administered by Fidelity. Employees could contribute 1% to 15% of their base earnings, subject to a cap.

41.  As indicated above, several of the Debtors' medical plans are self-insured and have approximately 35% of the premiums collected from the Employee's paychecks. The claims that are submitted for such medical plans were historically processed and paid over a period of approximately six weeks. Due to the need to wind-down the operations, the Debtors terminated nearly all of their Employees prior to the Petition Date. Many of the former Employees, in the

-13-

normal course of their affairs, underwent medical evaluations or treatments prior to the Petition Date with the understanding that such procedures would be covered by their insurance, for which they made significant contributions through payroll deductions. In the event that these claims are not processed, these former Employees will suffer significant hardship. The Debtors estimate that approximately $1.8 million of medical insurance claims will need to be processed through this program over a period of approximately six weeks.

42.     The Debtors' Employees that remain employed are vital to the successful wind-down of the Debtors' businesses. The Employees' efforts subsequent to the last payroll date have significantly increased the value of the Debtors ' estates. The Employees' efforts in the future are expected to continue to increase the value of the estates. The return of the Debtors' equipment to the Debtors' facilities and the liquidation thereof, the delivery out of the freight in the Debtors' system, and the collection of outstanding receivables are also significant benefit to the estates and require the ongoing efforts of the remaining Employees. The Debtors believe that significant portions of the workforce that are necessary to wind-down the operations, including the management, would cease providing services to the estate if these obligations to the Employees, including the payments on the self-insured medical plans, are not met.

**e.      Pending Tax Payments, Sales Tax/ Use Tax Motion.**

43.     By this Motion, the Debtors seek authority (i) to allow its banks to honor all payments recently made to any federal or state taxing authority (the "Taxing Authorities"), which have not been presented for payment as of the Petition Date, and (ii) to pay any prepetition sales and use taxes that accrued prior to the Petition Date to the Taxing Authorities in the ordinary course of the Debtors' businesses when such payments become due.

-14-

44. The Debtors, based on historical data, are likely to have incurred less than $18,000 in outstanding sales and use taxes as of the Petition Date.

45. The Debtors' core business of freight shipping is not subject to sales tax. However, the Debtors do purchase certain items out of state that are subject to use tax remittance. The Debtors, therefore, believe the amount of sales and/or use tax in question is minimal.

46. It is my understanding that the taxes that are the subject of this Motion are entitled to priority status pursuant and would be paid ahead of all general unsecured claims. Therefore, the payment of these sales and use taxes at this time only affects the timing of their payment and does not prejudice the rights of other creditors.

47. The Debtors believe that failure to pay the sales and use taxes may adversely affect the Debtors' continued ability to conduct business in the states where such business is conducted. The Debtors are seeking to wind down their operations in a quick and orderly fashion and any disruption of this process will directly impair the recoveries of creditors in these cases.

48. The Debtors further submit that, to the extent the Debtors have collected sales and use taxes from their customers, such funds may constitute so-called "trust fund" taxes that were required to be collected from third parties and must be held in trust by the Debtors for payment to the Taxing Authorities. The Debtors, therefore, do not have any equitable interest in the sales and use taxes. Therefore, I am requesting the Court to grant the Motion and authorize the Debtors to pay the sales and use taxes to the Taxing Authorities as they come due.

DEL1 68359-1

### f.   **Adequate Assurance for Utilities Motion**

49.     In the ordinary course of business, the Debtors regularly incur expenses for water, sewer, electricity, gas, local and long distance telephone service, cellular phone service, internet service and other utility services from approximately 33 service providers (the "Utility Providers").[3]   A complete list is attached to the Motion. The Utility Providers provide traditional utility services necessary for continued operation of the Debtors' day-to-day business. The Debtors have a long and established payment history with most or all of the Utility Providers indicating generally consistent payment for utility services.

50.     Uninterrupted utility services are critical to the ability of the Debtors to operate and to maximize value for the benefit of their creditors.  The Debtors could not operate without utility service.  If any Utility refuses or discontinues service, the Debtors would be forced to cease or severely curtail operations.  Such an event would substantially disrupt operations and result in loss of revenues, which could irreparably harm and jeopardize the orderly liquidation process.

51.     As of the Petition Date, the Debtors may have (i) prepetition accounts payable to certain Utility Providers; (ii) outstanding checks to certain Utility Providers in payment for prepetition charges for utility services that had not cleared the Debtors' bank account as of the Petition Date; or (iii) liabilities for prepetition utility services for which the Debtors had not been billed.

52.     By this Motion, the Debtors request that the Court enter an order prohibiting (i) any of the Utility Providers from altering, refusing, or discontinuing services to the Debtors;

---

[3] The Debtors reserve the right to assert that any of the entities now or hereafter listed in Exhibit A are not "Utility Providers" within the meaning of section 366(a) of the Bankruptcy Code to assert that any such entity is compelled by contractual obligation, state or local law or otherwise, to continue to furnish services to the Debtors notwithstanding the filing of these chapter 11 cases.

(ii) approving the amount and method by which the Debtors may furnish certain Utility Providers with adequate assurance of payment for post-petition utility services and deeming the Utility Providers to have received adequate assurance of payment; (iii) establishing procedures and mechanisms under which the parties may determine adequate assurance of future payment; and (iv) authorizing the Debtor to supplement, as necessary, the Utility Service List and providing that any newly added Utility Provider will be subject to the terms of the order.

53.     The Debtors propose to provide additional assurance of payment by issuing a security deposit equal to approximately two weeks estimated average utility consumption (the "Utility Deposit(s)") to each Utility Provider identified in Exhibit A to the Motion, within ten (10) business days after the date of entry of an order granting the Motion. The Debtors estimate that the aggregate total of the Utility Deposits will be $125,000.00.

54.     The Utility Deposits, together with the Debtors' available cash and debtor-in-possession financing will enable the Debtors to timely pay all of their respective obligations to Utility Providers for post-petition utility services on an ongoing basis. The budget approved by the DIP Facility Lender provides for payment of the Debtors' post-petition utility bills.

55.     The Utility Deposits, the Debtors' available cash and the debtor-in-possession financing constitute adequate assurance of future payment to satisfy the requirements imposed by Section 366 of the Bankruptcy Code. Moreover, I understand that post-petition claims for utility services, to the extent allowed, will be entitled to administrative priority treatment.

56.     If any Utility Provider believes additional assurance is required, it may request such assurance. The Debtors propose the procedures outlined below (the "Adequate Assurance Protections"):

(a)     Any Utility Provider requesting assurance of future payment for utility service more than the Proposed Adequate Assurance must serve a request

-17-

(an "Additional Assurance Request") so that it is received by the Debtors at the following addresses: (i) Jevic Transportation, Inc., 600-700 Creek Road, Delanco, NJ 08075, Attention: David Gorman; and (ii) (iii) Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, 919 Market Street, Suite 1000, Wilmington, DE 19801-3062, Attention: Domenic Pacitti, Esquire.

(b) Any Additional Assurance Request must (i) be in writing; (ii) set forth the location(s) for which utility services are provided and the relevant account number(s); (iii) describe any deposits, prepayments, or other security currently held by the requesting Utility Provider; and (iv) explain why the requesting Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

(c) Upon receipt by the Debtors of an Additional Assurance Request at the addresses noted above, the Debtors shall have the greater of either (i) 14 days from the receipt of such Additional Assurance request, or (ii) 30 days from the Petition Date (collectively, the "Resolution Period") to negotiate with the requesting Utility Provider to resolve its Additional Assurance Request. The Resolution Period may be extended by agreement between the parties.

(d) The Debtors, with consent by their debtor-in-possession agent (the "DIP Agent"), may resolve any Additional Assurance Request by mutual agreement with the requesting Utility Provider and without further order of the Court and may, in connection with any such resolution, with consent by its DIP Agent, provide the requesting Utility Provider with additional adequate assurance of future payment in a form satisfactory to the Utility Provider, including, without limitation, cash deposits, prepayments, and/or other forms of security, if the Debtors believe such additional assurance is reasonable.

(e) If the Debtors and any Utility Provider are unable to reach agreement regarding the additional assurances requested by the Utility Provider, either party may request a hearing before the Bankruptcy Court.

(f) Pending the resolution of the Additional Assurance Request at a Determination Hearing, the requesting Utility Provider will be restrained from discontinuing, altering, or refusing service to the Debtors on account of unpaid charges for Prepetition services or on account of any objections to the Proposed Adequate Assurance.

57. The Debtors believe that they have identified all Utility Providers. If the Debtors omitted any Utility Provider, the Debtors request that the Court: (i) authorize the Debtors to provide notice and a copy of the Utility Order to the Utility Provider not listed in the Utility

Service List (the "Additional Utility Provider") and (ii) provide that an Additional Utility Provider is subject to the terms of the Utility Order. The Debtors propose that an Additional Utility Provider be afforded twenty (20) days from the date of service of the Utility Order to request additional assurance, if any, from the Debtors. Contemporaneously with service of the Utility Order on any Additional Utility Provider, the Debtors will file with the Court a supplement to the Utility Service List.

58.    The Debtors believe the procedures set forth herein are fair and reasonable and will provide the Utility Providers adequate assurance of payment.

g.    **Debtor-In-Possession Financing and Use of Cash Collateral Motion**

59.    An immediate and critical need exists for the Debtors to obtain additional financing. While the Debtors and the Debtors' Prepetition Lenders have reached a consensual arrangement for the use of cash collateral to fund various disbursements, operating on use of cash collateral alone is not sufficient to fund all of the Debtors' critical needs. The most glaring shortfall of operating on cash collateral alone is that the Debtors cannot adequately fund their operating expenses. Thus, as reflected in the budget attached as Exhibit C to the Debtor-in-Possession Financing and Use of Cash Collateral Motion, ("Budget"), the Debtors require financing to continue the wind down of their operations and to fund the orderly liquidation of their assets.

60.    The Debtors anticipate that the primary use of the funds to be made available under the Senior DIP Credit Agreement (the "Senior DIP Facility") will be for operating expenses and the expenses associated with the wind down of the Debtors' operations.

61.    The Senior DIP Agent and Senior DIP Lenders are willing to provide the financing contemplated herein, subject to the terms and conditions set forth herein and in the

other Senior DIP Financing Documents and the provisions of this Motion assuring that the Senior DIP Indebtedness (as hereinafter defined) and the Senior DIP Liens and various other claims, super-priority claims and protections pursuant to the Senior DIP Financing Documents will not be affected by any subsequent reversal or modification of the Interim Order or any other order. I believe that each of the Senior DIP Agents and the Senior DIP Lenders has acted in good faith in consenting to and in agreeing to provide the postpetition financing contemplated by this Motion and the other Senior DIP Financing Documents and the reliance of each of the Senior DIP Agent and the Senior DIP Lenders on the assurances referred to above is in good faith.

62.    Under the Senior DIP Facility, the Debtors will be entitled to borrow up to $60 million, approximately $34 million on a revolving basis. The proceeds of the Interim Facility shall be used for the payment of operating expenses and other expenses as reflected in the Budget, and to reimburse the issuing lender with respect to draws under the Existing Letters of Credit.

63.    The Prepetition Indebtedness due under the Prepetition Facility shall be paid in full upon entry of the Final Order, and thus the interest of the Prepetition Lenders in the collateral securing the Senior DIP Indebtedness (the "Senior DIP Collateral") will be adequately protected after the consummation of the Senior DIP Facility contemplated by this Motion.

64.    Among other things, approval of this Motion will minimize disruption of the Debtors' businesses and operations and permit them to deliver the freight that is in their system and to retrieve their assets and to continue to orderly wind-down their business and ultimately liquidate their assets for the benefit of the estate. The financing arrangements authorized hereunder are vital to avoid immediate and irreparable harm to the Debtors' estates.

Consummation of such financing arrangements is therefore in the best interests of the Debtors' estates.

65.     The financing and other arrangements for which authorization is sought have been negotiated in good faith and at arm's length among the Debtors and the Senior DIP Agents, on behalf of themselves and the Senior DIP Lenders, and the terms of such financing arrangements are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

66.     The Debtors request immediate entry of the Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). The permission requested herein to (i) enter into the Senior DIP Financing Documents and obtain funds, incur indebtedness and other financial accommodations thereunder and (ii) repay the Prepetition Financing is necessary to avoid immediate and irreparable harm to the Debtors.

67.     The Senior DIP Credit Agreement and other documents to be executed in connection therewith, are the result of arm's length negotiations between the Debtors and the Senior DIP Lenders. The Senior DIP Credit Agreement's principal provisions are:

| | |
|---|---|
| BORROWERS/GRARANTORS: | Jevic Transportation, Inc. ("Borrower"), Jevic Holding Corp. and Creek Road Properties, LLC (each a "Guarantor" and collectively the "Guarantors") each as a Debtor-in-Possession (each a "Debtor" and collectively the "Debtors"). |
| ADMINISTRATIVE AGENT: | The CIT Group/Business Credit, Inc. ("CIT", and in such capacity, the "Agent") |
| LENDERS: | A syndicate of banks, financial institutions and other entities expected to be comprised of the Prepetition Lenders, including CIT (collectively, the "Lenders"). |
| SENIOR DIP CREDIT FACILITY: | A total commitment of up to $60,000,000 (the "Commitment") comprised of a revolving credit facility in the amount of up to $60,000,000 (the "DIP Revolver"; |

-21-

the loans thereunder, "<u>DIP Revolver Loans</u>"), as set forth in a credit agreement (the "<u>DIP Credit Agreement</u>"), and certain other agreements and documents (collectively with the DIP Credit Agreement, the "<u>DIP Credit Documents</u>"), in form and substance mutually agreeable to the Agent, Lenders and the Borrowers and approved by the Bankruptcy Court (as so approved and documented, the "<u>Senior DIP Credit Facility</u>").

DIP REVOLVER:

The maximum amount available under the DIP Revolver will be $60,000,000 minus the Pre-Petition Obligations and the Carve-Out.

CLOSING DATE:

Closing Date to occur as promptly as is practical after the entry of the Interim Order, but no later than May 22, 2008 (the "<u>Closing Date</u>").

TERM/MATURITY DATE:

Borrowings shall be repaid in full, and the Commitment shall terminate (such date of termination, the "<u>Termination Date</u>"), at the earliest to occur of: (i) August 30, 2008, (ii) the effective date of a confirmed plan of reorganization or liquidation that provides for payment in full of all Obligations owing under the DIP Facility and the Pre-Petition Obligations (including the Surviving Pre-Petition Obligations) or is otherwise acceptable to Lenders in their respective sole discretion; (iii) the closing date of any sale of all or substantially all of the Debtors' assets; (iv) the entry of an Order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure by a secured party on material assets of the Debtors; or (v) the date on which (a) any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (b) a trustee under Chapter 11 of the Bankruptcy Code shall be appointed in any of the Cases, or (c) an examiner having enlarged powers relating to the operation of the business of the Debtors (beyond those set forth under section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed. Upon occurrence of the Termination Date, the Commitment shall terminate and the DIP Revolver Loans and other obligations under the Senior DIP Credit Facility shall be paid in full.

USE OF PROCEEDS:

The Senior DIP Credit Facility may be used for working capital and general corporate purposes consistent with the Budget and to pay the costs and expenses related to the administration of the Cases and for payment of certain

Prepetition expenses as contemplated in the Budget and in each case as set forth in the applicable Order, or as consented to by the Required Lenders in their sole discretion and as are approved by the Bankruptcy Court and to pay the Prepetition Financing.

INTEREST AND CERTAIN FEES:

The DIP Revolver Loans will bear interest at Prime Rate plus 2.5%

Upfront Fee: $200,000

Deferred Fee: $350,000

Letter of Credit Fee: 3.50%

DEFAULT RATES:

The rate otherwise in effect plus 2.00% and such interest shall be payable on demand.

PRIORITY AND LIENS:

All DIP Revolver Loans and other obligations under the Senior DIP Credit Facility, and all guaranties of all of the foregoing by the Guarantors, shall at all times:

(i)    pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status in the Cases,

(ii)    pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all tangible and intangible property of the Debtors' respective estates in the Cases that is not subject to valid, perfected and non-avoidable liens as of the respective petition dates, including without limitation, all inventory, accounts receivable, general intangibles, contracts, any right to payment or delivery of property under a repurchase agreement, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property and capital stock of the subsidiaries of either of the Debtors, excluding avoidance actions,

(iii)    pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all tangible and intangible property of the Debtors' respective estates in the Cases that is subject to valid, perfected and non-avoidable liens or to valid liens in existence on the respective petition dates that are perfected subsequent to such commencement as

-23-

permitted by Section 546(b) of the Bankruptcy Code (other than the property that is subject to the Prepetition Liens referred to below, which shall be primed by the liens to be granted to secure the DIP Revolver Loans and other obligations of the Borrowers under the Senior DIP Credit Facility), and

(iv) pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the property of the Debtors' respective estates in the Cases that is subject to existing liens that secure the obligations of the Debtors under or in connection with Prepetition Senior Credit Agreement among the Borrowers, the Prepetition Lenders and CIT, as administrative agent subject in each case only to (x) prior to the occurrence of an Event of Default or the Termination Date, the payment of allowed professional fees and expenses by the professionals retained pursuant to sections 327 or 1103(a) of the Bankruptcy Code, by the Debtors and the Committee in the Cases as authorized in the Budget; (y) upon the occurrence of an Event of Default or the Termination Date, the payment of subsequently incurred allowed professional fees and expenses by the professionals retained, pursuant to sections 327 or 1103(a) of the Bankruptcy Code, by Debtors and the Committee in the Cases in an amount not to exceed (the "Carve-Out Amount"), specifically, $1,335,000, minus (i) any retainers still being held and available for application to the outstanding professional fees and expenses, and (ii) any fees and expenses previously paid pursuant to clause (x) above and (iii) the payment of fees pursuant to 28 U.S.C. § 1930 (clauses (x) and (y) together, the "Carve-Out").

The property of the Debtors subject to the liens securing the Senior DIP Credit Facility described under this "Priority and Liens" paragraph shall be referred to herein as the "Collateral".

The Liens and Superpriority Claims afforded to the Senior DIP Lenders and Prepetition Lenders excludes avoidance actions under chapter 5 of the Bankruptcy Code, commercial tort claims and the proceeds thereof.

CASH
COLLATERAL:      The Commitment shall not be available for use by the Borrowers unless the Bankruptcy Court shall have

-24-

authorized the use by the Debtors of proceeds of Prepetition collateral that constitutes "cash collateral" (within the meaning of the Bankruptcy Code) in respect of the Primed Liens for the purposes that are described under "Use of Proceeds" above.

APPLICATION OF PROCEEDS:

All amounts received by the Debtors whether consisting of proceeds of Prepetition Collateral, Senior DIP Collateral, Adequate Protection Collateral or otherwise, shall be applied in the following order: first, to permanently reduce the Debtors' obligations to the Prepetition Agent and the Prepetition Lenders until paid in full; and second, to reduce the Senior DIP Indebtedness in accordance with the Senior DIP Financing Documents.

BUDGET COMPLIANCE:

The Borrowers shall not make more than the greater of (i) 105% of, or (ii) a $15,000 variance with respect to, any one specific disbursement set forth in the Budget; provided that if the aggregate revenues are higher than those set forth in the Budget, the aggregate disbursements may be increased by the same percentage by which the aggregate revenues exceed those set forth in the Budget; provided, further, however, that in no event shall the total aggregate disbursements made by the Loan Parties during the term hereof exceed the total aggregate disbursements set forth in the Budget.

EVENTS OF DEFAULT:

Usual and customary for facilities of this type, including but not limited to (each an "Event of Default" and collectively, "Events of Default"):

Failure to pay interest, principal, or fees when due; any representation or warranty found to be materially incorrect when made; breach of any affirmative, negative or financial covenant (subject to grace periods); material damage to or loss of assets; conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code; the dismissal of any of the Cases; the appointment in any of the Cases of a Chapter 11 trustee or an examiner with expanded powers; the grant of any super priority administrative expense claim or any lien (other than in favor of the holders of the Prepetition Debt as set forth above) which is part passu with or senior to those of the Agent and the Lenders; any payment of pre-petition debt (other than as provided herein and other than (a) payments under customary first day orders ("First Day Orders") acceptable to the Senior DIP Agent and the Lenders, and (b) payments as may be approved by the

-25-

Bankruptcy Court that are reasonably acceptable to the Agent and the Lenders); the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in material assets of the Borrowers; any reversal, revocation or modification without the consent of the Senior DIP Agent of such order or any other order of the Bankruptcy Court with respect to the Cases and affecting the Senior DIP Credit Facility.

**INDEMNIFICATION:**    The DIP Credit Documents provide that the Borrowers agree to indemnify and hold the Senior DIP Agent and the Senior DIP Lenders and their respective shareholders, directors, agents, officers, subsidiaries and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party by reason of or resulting from the Senior DIP Credit Facility, the transactions contemplated thereby or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such indemnified persons is a party thereto, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party as finally determined by a final non-appealable order of a court of competent jurisdiction.

The DIP Credit Documents shall provide that upon the satisfaction in full of all Pre-Petition Obligations and all obligations under the Senior DIP Credit Facility (other than, in each case, contingent indemnification obligations as to which no then current claim has been identified or asserted), that all liens on assets of the Debtors shall be released.

**GOVERNING LAW:**    To the extent not controlled by Federal law and regulations, the laws and decisions of the State of New York.

**EXPENSES:**    Reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and other out of pocket expenses of the Senior DIP Agent and the Senior DIP Lenders in connection with the Senior DIP Credit Facility will be paid by the Borrowers, whether or not the transactions contemplated hereby are consummated.

-26-

68. The Senior DIP Credit Agreement provides that all amounts received by the Debtors whether consisting of proceeds of Prepetition Collateral, Senior DIP Collateral, Adequate Protection Collateral or otherwise, shall be applied in the following order: first, to permanently reduce the Debtors' obligations to the Prepetition Agent and the Prepetition Lenders until paid in full; and second, to reduce the Senior DIP Indebtedness in accordance with the Senior DIP Financing Documents.

69. The Senior DIP Credit Agreement provides that the Debtors shall pay the Upfront Fee set forth in the Senior DIP Credit Agreement in the aggregate amount of $200,000.00. Any such fee agreed to by the Debtors shall be afforded an administrative priority claim status under section 503(b) of the Bankruptcy Code junior, in all respects, to the superpriority afforded the Senior DIP Indebtedness

70. To the extent that the Debtors obtain full and final approval of the Senior DIP Facility at the Final Hearing and the conditions precedent under the Senior DIP Credit Agreement to the availability of the Senior DIP Interim Facility are satisfied or waived, then, within two business days after the closing of such facility, the Debtors shall repay the Prepetition Lenders the then remaining unpaid principal amount of the Prepetition Financing in accordance with the Senior DIP Credit Agreement, any accrued but unpaid interest (at the non-default rate) and reasonable professional fees and disbursements (as determined by the Bankruptcy Court, with any disputed fees and disbursements to be escrowed pending final determination by the Bankruptcy Court) (the "Prepetition Claims"). Upon paying the Prepetition Claims, the Prepetition Lenders irrevocably agree and consent to the only required form of continuing adequate protection necessary to secure payment of the Prepetition Claims being the provision of replacement liens and priority claims as provided herein, and all other adequate protection duties

-27-

or obligations owed by the Debtors to the Prepetition Lenders under the terms of this Order shall no longer be operative or enforceable against the Debtors. In the event that the Debtors are unable to obtain full and final approval of the Senior DIP Facility, the Debtors may seek full and final approval of the Interim Commitments at the Final Hearing.

71. The Debtors request that the Court conduct an expedited preliminary hearing on the Motion (the "Preliminary Hearing") and authorize the Debtors from and after the entry of the Interim Order until the Final Hearing to obtain interim credit under the Senior DIP Credit Agreement. This will enable the Debtors to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest pending the Final Hearing.

DEL1 68359-1

In conclusion, for the foregoing reasons and the reasons set forth in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as is appropriate.

I certify under penalty of perjury that the foregoing is true and correct based upon my knowledge, information and belief as set forth in this Declaration.

David H. Gorman, President and CEO
Jevic Holding Corp.,
Jevic Transportation, Inc. and Creek
Road Properties, LLC