# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**Jevic Holding Corp.**, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-11006 (BLS)<br><br>(Jointly Administered) |
| **Casimir Czyzewski, Melvin L. Myers, Jeffrey Oehlers, Arthur E. Perigard, and Daniel C. Richards, on behalf of themselves and all others similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**Jevic Transportation, Inc., Jevic Holding Corp., Creek Road Properties, LLC, Sun Capital Partners, Inc., and John Does 1-10,**<br><br>Defendants. | Adv. No. 08-50662<br><br><br><br>Related to Adv. Docket Nos. 3, 182, 183, 194, 196, 201, 209, 212, & 222 |

LOIZIDES, P.A.
Christopher D. Loizides, Esq.
1225 King Street
Suite 800
Wilmington, DE 19801

    -and-

MORRIS, NICHOLS,
ARSHT & TUNNELL LLP
Curtis S. Miller, Esq.
1201 N. Market Street
18th Floor
Wilmington, DE 19801

    -and-

| | |
|---|---|
| OUTTEN & GOLDEN LLP | KIRKLAND & ELLIS LLP |
| Jack A. Raisner, Esq. | James P. Gillespie, Esq. |
| Rene S. Roupinian, Esq. | Jason Parish, Esq. |
| 3 Park Avenue, 29th Floor | 655 Fifteenth Street, N.W. |
| New York, NY 10016 | Washington, D.C. 20005 |
| | |
| *Counsel for Plaintiffs and the Certified WARN Class* | *Counsel for Defendant Sun Capital Partners, Inc.* |

# OPINION[1]

Before the Court are cross-motions for summary judgment on claims arising under the WARN Act. Casimir Czyzewski, Melvin L. Myers, Jeffrey Oehlers, Arthur E. Perigard, and Daniel C. Richards, on behalf of themselves and all others similarly situated (collectively, the "Class Plaintiffs") initiated this adversary proceeding against Defendants Jevic, Jevic Holding Corp., Creek Road Properties, LLC (collectively, the "Debtors"), and Sun Capital Partners, Inc. ("Sun Cap"), the Debtors' ultimate parent.[2] After the close of discovery, Sun Cap filed a motion for summary judgment (the "MSJ") [Adv. Docket No. 182] arguing that it cannot be held liable under either the WARN Act or the New Jersey WARN Act because it did not employ the Class Plaintiffs, cannot be characterized as a "single employer" with the Debtors, and cannot be held liable for actions of any other Sun Cap entities. Shortly thereafter, Class Plaintiffs filed a motion for partial summary judgment (the "Partial MSJ") [Adv. Docket No. 196] arguing that Sun Cap was a "single employer" with the Debtors, and as such, is liable under the WARN Act and the New Jersey WARN Act. For the reasons that follow, the Court will deny Class Plaintiffs' Partial MSJ and grant Sun Cap's MSJ.

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

[2] This Opinion pertains solely to Defendant Sun Cap. The claims and summary judgment motion that relate to the Debtors are discussed and adjudicated in a separate companion Opinion issued contemporaneously herewith. *See* Adv. Docket No. 191.

~ 2 ~

# I. BACKGROUND

The material facts are largely undisputed. Jevic Transportation, Inc. ("Jevic") began operations in 1981 and described itself as providing a hybrid less-than-truckload and truckload carrier service for regional and inter-regional time definite delivery across the United States and parts of Canada. All of the Debtors' operations occurred through Jevic. Prior to filing these chapter 11 cases in 2008, Jevic employed approximately 1,785 employees and was headquartered in Delanco, New Jersey with its largest terminal located there. The Debtors operated nine additional terminals and one sales office at various locations throughout the United States. Debtor Creek Road Properties, LLC held no assets and had no operations. Similarly, Debtor Jevic Holding Corp. had no independent operations, but owns 100% of the issued and outstanding stock of Jevic.

In 1997, Jevic had an initial public offering and was later acquired by Yellow Corporation in 1999. In 2002, Yellow Corporation spun off Jevic and its sister company, Saia Motor Freight Line, to form SCS Transportation.

Beginning in 2006, the Debtors' revenue declined due to a variety of factors including the decline in the housing market, the tightening of the credit markets, and the slowdown in the automotive industry, all of which led to a nationwide decline in freight volumes.[3] In early 2006, SCS Transportation began evaluating alternatives for Jevic, including a sale or liquidation, and contemplated filing for bankruptcy.[4]

On June 30, 2006, Sun Transportation, LLC ("Sun Trans"), a wholly-owned subsidiary of the Defendant Sun Cap, acquired the Debtors in a leveraged buyout, which included an $85 million revolving credit facility from a bank group led by CIT. Sun Cap, through Sun Trans, paid $1 million to Jevic Holding Corp., which was created to effectuate the acquisition of all of Jevic's shares. CIT's financing agreement required that the Debtors maintain assets and collateral of at least $5 million in order to access its line of credit. Upon the merger, Jevic and Sun Cap entered into a Management Services Agreement.[5] This agreement governed the relationship between Sun

---

[3] *See* Gorman Decl. ¶ 18 [Docket No. 3].
[4] *See* Def.'s App. 180, Paulson Dep. 72:2-11, Dec. 21, 2010 [Adv. Docket No. 184].
[5] *See* Def.'s App. 265-72.

Cap and Jevic, providing for consulting services and compensation for such services.

Throughout 2007, the Debtors' business struggled due to the general economic downturn and the negative impact of fuel surcharges on its profitability. While the Debtors instituted cost-saving strategies, Sun Cap proposed to CIT numerous capital investments in the Debtors in exchange for increased credit availability. By the end of 2007, the Debtors' assets fell below $5 million, in default of CIT's financing covenant. Thereafter, CIT and the Debtors entered into a forbearance agreement that went into effect on January 8, 2008. The forbearance agreement called for Sun Cap to provide a $2 million guarantee, which it did. Sun Cap negotiated further forbearance extensions through April 2008.

In February 2008, Jevic entered into an agreement for consulting services with Morris Anderson & Associates, Ltd. ("Morris Anderson"). By the end of February, Morris Anderson had prepared and circulated a 13-week cash flow projection showing that Jevic would keep assets and collateral above the $5 million limit until at least May 9, 2008.

Also in February, Jevic entered into an agreement with Black Management Advisors to retain Brian Cassady as Interim Vice President. Cassady's engagement was to provide consulting services consisting of operational and financial consulting as well as advice and recommendations to Jevic on strategic, management, operational, financial, and business restructuring matters as requested by Jevic's board. Additionally, Jevic retained investment bank Stifel Nicolaus to seek potential buyers for the company.

On March 27, 2008, CIT presented Sun Cap with two options: (i) Sun Cap would invest additional funds in Jevic in exchange for a long-term forbearance agreement; or (ii) Sun Cap would receive 45-day forbearance in exchange for beginning an active sale process. Sun Cap chose not to invest more money in Jevic, and Jevic therefore began an active sale process.

In early April 2008, Daniel Dooley, a Morris Anderson employee who was working on the Jevic project, was retained as the Debtors' Chief Restructuring Officer ("CRO"). Jevic announced a reorganization plan, which included closing unprofitable facilities and liquidating assets. Implementation of this plan was intended to allow Jevic to realize substantial monthly savings, and projections accompanying the plan reflected asset values maintained above $5 million. The reorganization would not be fully implemented until the beginning of June 2008, by which time Jevic was estimated to save approximately

$1.0-1.4 million monthly. However, decreased sales, increasing costs, and disappointing equipment appraisal values meant that Jevic failed to meet its earlier optimistic projection. By the end of April, Jevic's assets again fell below $5 million, in default of CIT's financing covenant. In light of this, the parties agreed, among other things, to move the expiration of the forbearance agreement from May 19 to May 12.[6]

During these months, Jevic met with two potential buyers, Pitt Ohio and New Century, and Pitt Ohio submitted a bid letter expressing preliminary interest.[7] However, neither buyer was willing to sign a non-disclosure agreement, effectively killing the sale process. Jevic also met with the New Jersey Economic Development Authority ("NJEDA") to seek capital,[8] but to no avail.

By May 13, 2008, Jevic had only two options: sell the company to Pitt Ohio or prepare for bankruptcy. CIT refused to fund further borrowing unless Sun Cap invested more money to fund a bridge to complete the sale to Pitt Ohio. Sun Cap would need to spend more money to close the sale than the sale would generate, which it was not willing to do. Three days later, on May 16, 2008, with no viable sale or funding available to Jevic and with the forbearance agreement with CIT expiring, Jevic's board formally authorized a bankruptcy filing. Jevic sent its employees termination notices pursuant to the Worker Adjustment and Retraining Notification Act (the "WARN Act") that were received on May 19, 2008.

The next day, on May 20, 2008, the Debtors filed a voluntary petition in this Court under chapter 11 of the Bankruptcy Code. On March 23, 2008, the Class Plaintiffs filed this adversary proceeding by its amended class action complaint against the Debtors and Sun Cap alleging WARN Act and New Jersey WARN Act violations for failing to provide employees with the requisite 60-day notice before a plant closing or mass layoff.[9] The Court certified the class and directed the named Plaintiffs as the class representatives.[10]

---

[6] *See* Pls.' App. 639 [Adv. Docket No. 195].
[7] Def.'s Supplemental App. 467, 469 (attaching emails that discuss the two potential buyers) [Adv. Docket No. 210].
[8] *Id.* at 466 (attaching emails that discuss the Debtors' financials for an upcoming meeting with the NJEDA).
[9] Adv. Docket No. 3.
[10] Adv. Docket No. 28. The Court issued an Order amending the certification of the class on May 16, 2008 [Adv. Docket No. 29].

On September 26, 2012,[11] Defendant Sun Cap filed its MSJ and memorandum in support of its motion.[12] Class Plaintiffs filed an answering brief on October 26, 2012[13] and Sun Cap filed a reply November 9, 2012.[14]

Additionally, Class Plaintiffs filed its Partial MSJ on October 16, 2012 with an accompanying memorandum in support of its motion.[15] Sun Cap filed an answering brief on November 14, 2012[16] and Class Plaintiffs filed a reply on December 3, 2012.[17] The matter has been fully briefed and argued, and is ripe for decision.

## II. THE PARTIES' POSITIONS

Class Plaintiffs argue that Defendant Sun Cap was a "single employer" with the Debtors and as such, is liable for any WARN Act violations that the Debtors may have committed. Class Plaintiffs allege that Sun Cap satisfies the five-factor test adopted by the Third Circuit for determining whether an affiliated corporate entity may be held liable under the WARN Act.

In response to Class Plaintiffs' arguments and in its own MSJ, Defendant Sun Cap argues first that it was not the Class Plaintiffs' "employer" and therefore, it has no WARN Act liability. Sun Cap next argues that the Class Plaintiffs cannot impute any other Sun Cap entity's conduct to the Defendant Sun Cap, but even if it could, no other Sun Cap entity satisfies the five-factor "single employer" test.

## III. JURISDICTION & VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), (b)(1), and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), and (O).[18]

---

[11] In the lengthy intervening period, the Court granted, by agreement of the parties, numerous amended scheduling orders to extend fact discovery and dispositive motion deadlines. The Court denied by Order dated September 25, 2012 Class Plaintiffs' motion to further extend discovery, leading then to the instant motion practice. *See* Adv. Docket No. 181.

[12] Adv. Docket Nos. 182 & 183, respectively.

[13] Adv. Docket No. 201.

[14] Adv. Docket No. 209.

[15] Adv. Docket Nos. 196 & 194, respectively.

[16] Adv. Docket No. 212.

[17] Adv. Docket No. 222.

[18] The parties are in agreement that this is a "core" proceeding. *See* Am. Compl. ¶ 5 [Adv. Docket No. 3]; Ans. ¶ 5 [Adv. Docket No. 10].

## IV. LEGAL ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party and drawing all inferences in favor of that party, there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986). Any doubt must be resolved in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The movant bears the initial burden of establishing that no genuine dispute of material fact exists. *See, e.g.*, *D'Amico v. Tweeter Opco, LLC (In re Tweeter Opco, LLC)*, 453 B.R. 534, 539 (Bankr. D. Del. 2011). Once the moving party carries its burden, the opposing party must go beyond the pleadings and identify specific facts showing more than "[t]he mere existence of a scintilla of evidence" that a genuine dispute of material fact exists. *Anderson*, 477 U.S. at 252; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts").

At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine dispute for trial. *Celotex*, 477 U.S. at 317. If there is a genuine dispute of material fact, the Court cannot grant summary judgment. *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del. 2005). Further, substantive law determines which facts are material. *Anderson*, 477 U.S. at 248. Only facts that "might affect the outcome of the suit under governing law" are considered material and will preclude summary judgment. *Id.* A dispute regarding a material fact is genuine "when reasonable minds could disagree on the result." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

When ruling on cross-motions for summary judgment, the Court's analysis does not change. "Each party still bears the initial burden of establishing a lack of genuine issues of material fact." *Liquidating Trust of U.S. Wireless Corp. v. Huffman (In re U.S. Wireless Corp.)*, 386 B.R. 556, 560 (Bankr. D. Del. 2008). Each motion must be considered independently, and "both motions will be denied if any genuine issues of material fact exist." *WM Inland Adjacent LLC v. Mervyn's LLC (In re Mervyn's Holdings, LLC)*, Adv. No. 09-50920(KG), 2013 WL 85169, at *3 (Bankr. D. Del. Jan. 8, 2013) (citation omitted).

## B. The WARN Act and the "Single Employer" Test

The WARN Act provides that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to each affected employee. 29 U.S.C. § 2102(a)(1); *see also* 20 C.F.R. § 639.2 (stating that 60-days advance notice is the minimum). The purpose of the WARN Act is to protect workers and their families by providing them with advance notice of a layoff. 20 C.F.R. § 639.1(a). This advance notice is intended to provide "workers and their families some transition time to adjust to the prospective loss of employment" and to seek alternative jobs. *Id.*

The WARN Act defines an "employer" as "any business entity" that employs 100 or more employees." 29 U.S.C. § 2101(a)(1). Although the WARN Act does not define "business entity," the Department of Labor's ("DOL") regulations state that "subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent." 20 C.F.R. § 639.3(a)(2). The DOL states that some factors to be considered in making this determination are: "(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." *Id.*

The Third Circuit has adopted the DOL's five-factor test above to determine whether affiliated corporations may be considered a "single employer" for WARN Act purposes. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 478 (3d Cir. 2001). Regardless of an affiliate's status as lender or parent, the DOL factors apply to determine liability under the WARN Act.[19] *Id.* at 494-95.

## C. Application of the "Single Employer" Test

---

[19] The Court notes that for the purposes of "single employer" liability, the analysis under the WARN Act and the New Jersey WARN Act are substantially similar. *See DeRosa v. Accredited Home Lenders, Inc.*, 22 A.3d 27, 40 (N.J. Super. Ct. App. Div. 2011) (adopting the five-factor DOL test to determine "single employer" liability for New Jersey WARN Act purposes). The model for the New Jersey WARN Act was its federal counterpart. *Id.* at 36 (stating that both WARN Acts have the same purpose). Therefore, the Court's analysis below pertains to claims brought under both the WARN Act and the New Jersey WARN Act with equal force.

The Third Circuit has stressed that the factors "are not an exhaustive list[,]" concluding that the test is one of balancing. *Id.* at 478. Courts must take a functional approach that focuses "on the nature and degree of control possessed by one corporation over another." *Id.*; *see also Sanchez v. AFA Foods, Inc. (In re AFA Inv., Inc.)*, Adv. No. 12-50710(MFW), 2012 WL 6544945, at *3 (Bankr. D. Del. Dec. 14, 2012) (stating that "the factors are not balanced equally"). Moreover, the first and second factors alone—common ownership and common directors or officers—are not sufficient to establish that two entities are a "single employer." *See Pearson*, 247 F.3d at 494. Likewise, the fifth factor—dependency of operations—"cannot be established by the parent corporation's exercise of its ordinary powers of ownership." *Id.* at 501 (citation omitted). The Court will discuss each of the five factors below. In sum, the Court finds that three of the factors, most notably de facto exercise of control, weigh strongly in favor of finding no "single employer" liability.[20] Finding no genuine dispute of material fact with respect to the issue of "single employer" liability, the Court will grant Defendant Sun Cap's MSJ and deny Class Plaintiffs' partial MSJ.

### 1. Common Ownership

Class Plaintiffs contend that this factor weighs in their favor because Sun Cap is the parent corporation of the Debtors and had financial control over its subsidiary, the Debtors.[21] Defendant Sun Cap does not dispute common ownership but rather argues that common ownership—and even common directors and/or officers—is insufficient to establish "single employer" liability.[22]

The Court finds that common ownership exists and finds the Defendant's flow chart reflecting the Debtors' ownership structure particularly helpful.[23] Defendant Sun Cap owns 100% of the equity in Sun Trans, which wholly owns Jevic Holding Corp.; both were created for Sun Cap's acquisition of the Debtors. Jevic Holding Corp. wholly owns Jevic, and together with Creek Road Properties, Inc., constitute the Debtors. As a direct parent corporation of the Debtors, there is no

---

[20] Defendant Sun Cap argues that it cannot be held liable for the actions of other non-defendant Sun Cap entities. Because the Court finds no "single employer" liability between the Debtors and any Sun Cap entity, this issue is not addressed.
[21] Pls.' Op. Br. 33 [Adv. Docket No. 194].
[22] Def.'s Ans. Br. 40 [Adv. Docket No. 212].
[23] *See* Def.'s App. 374 [Adv. Docket No. 184].

dispute that common ownership exists. Thus, this factor weighs in favor of the Class Plaintiffs.

### 2. Common Directors and/or Officers

Class Plaintiffs contend that this factor weighs in its favor because Sun Cap and the Debtors shared common directors and officers. Defendant Sun Cap argues that no overlap exists between Jevic's "formal management team" and any Sun Cap entity.

This factor examines whether two corporations: "(1) actually have the same people occupying officer or director positions with both companies; (2) repeatedly transfer management-level personnel between the companies; or (3) have officers and directors of one company occupying some sort of formal management position with respect to the second company." *Pearson*, 247 F.3d at 498; *see also In re Tweeter Opco, LLC*, 453 B.R. 534, 543 (stating that the test is "whether any of the same individuals were a part of the formal management teams of each company").

It is undisputed that Jevic Holding Corp.'s three-member board of directors consisted of Michael Gillen, Dixon McElwee, and David Gorman. While sitting on Jevic Holding Corp.'s board of directors, Gillen also held an officer title as operations managing director of Sun Trans,[24] and McElwee held the title of operating vice president of the same.[25]

Sun Cap argues that Jevic's "senior management team," not its board of directors, controlled the company's day-to-day operations, and therefore, since no Sun Cap officers or directors were on Jevic's "senior management team," Class Plaintiffs cannot satisfy this factor.[26] However, the courts in *In re Tweeter Opco, LLC* and *Pearson* both held that the test is whether the individuals are a part of the formal management team, referring to formal officer or director titles. *See In re Tweeter Opco, LLC*, 453 B.R. at 543 (holding that the common director or officer factor was satisfied because George Schultze was the CEO of Tweeter Newco and also chairman of the board of both Tweeter Newco

---

[24] Pls.' App. 185, McElwee Dep. 53:3-8, Aug. 2, 2012 ("Mike Gillen was the operations managing director. And as such would be directly responsible inside the Sun families to report on and monitor the portfolio company that had been assigned to him; in this case, Jevic Transportation.") [Adv. Docket No. 195]); Pls.' App. 263, Gillen Dep. 21:21-23, Aug. 8, 2012 ("I was appointed director" of one of the Jevic companies.).

[25] Pls.' App. 1077, Gorman Dep. 188:2-7, Sept. 4, 2012.

[26] Def.'s Ans. Br. 39-40.

and the Debtor); *Pearson*, 247 F.3d at 498-99 (holding that no person held a director or officer position both with CompTech and with GECC). In fact, a similar argument based on control, that the Third Circuit declined to accept, was made by the plaintiffs in *Pearson*. *See* 247 F.3d at 498 (The court concluded that "[t]he Plaintiffs' theory, by contrast, is more appropriately employed to satisfy other prongs of the test, such as the 'de facto exercise of control' factor…."). The Third Circuit stressed that this factor "specifically require[s] the presence of common *directors* or *officers*." *Id.* (emphasis in original). Therefore, the Court rejects Sun Cap's argument, and finds that there is no genuine dispute of material fact that Sun Cap and the Debtors shared common directors or officers.[27] This factor weighs in favor of the Class Plaintiffs.

### 3. De Facto Exercise of Control

Class Plaintiffs argue that Defendant Sun Cap's decision not to fund the Debtors, a general lack of independence, and sharing of in-house counsel weighs in favor of finding de facto control by Sun Cap. In response, and in its own MSJ, Sun Cap argues that no Sun Cap entity exercised de facto control over the Debtors because no Sun Cap entity was responsible for the decision to terminate the Debtors' employees nor was it responsible for the decision to send out employee WARN notices.

The case law with respect to this factor is clear. The Court must consider "whether the parent has specifically directed the allegedly illegal employment practice that forms the basis for the litigation." *Pearson*, 247 F.3d at 491; *see also In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008) ("The core of this factor is whether one company 'was the decision-maker responsible for the employment practice giving rise to the litigation.'") (citation omitted). This factor is "not intended to support liability based on a parent's exercise of control pursuant to the ordinary incidents of stock ownership." *Pearson*, 247 F.3d at 503.

The Court finds the facts in *Pearson* instructive for this factor of the DOL test. The debtor, CompTech, obtained a $25 million loan from GECC in exchange for pledge agreements for all of its stock and the right to vote the stock in the event of default. *Id.* at 478. Shortly thereafter, CompTech defaulted on its loan, and GECC exercised its right to vote and install new boards of directors in CompTech and its

---

[27] The Court, however, notes that common ownership coupled with common management, without more, is an insufficient basis for liability under the WARN Act. *See Pearson*, 247 F.3d at 494.

~ 11 ~

affiliate companies. *Id.* at 479. GECC then hired a consultant, Thomas Gaffney, who served as CEO of CompTech and its affiliates. Through amendments to the loan agreement, CompTech needed GECC's approval to borrow additional money, reorganize its stock, conduct any mergers or acquisitions, or hire employees with salaries in excess of $100,000. *Id.* "GECC exercised continuing oversight of [CompTech's] finances pursuant to the loan agreement, occasionally agreeing to waive penalties and extend further loans to the cash-strapped company." *Id.* at 480. CompTech sought approval of many decisions, including executive compensation and sale of equipment, while providing GECC with updates of its financial condition. Further, Gaffney wrote to GECC stating that CompTech needed approval on a number of projects stating "I am prepared to do whatever G.E. wants relative to CompTech." *Id.*

The court was content that all of the aforementioned control by GECC did not amount to "de facto exercise of control." The court was only "given pause by the extent of GECC's involvement in the decision to close the plant." *Pearson*, 247 F.3d at 504. The court stated:

> CompTech was kept operational for three years solely as a result of GECC's own decision to hold on to CompTech and ensure the company's return to profitability. During this time, CompTech was almost always behind in its payments to GECC, and was only able to survive by GECC's extension of due dates and additional financing. Therefore, for three years, GECC was aware that its funding was the only thing keeping a troubled company afloat. It continued to invest, but when it finally concluded that CompTech could not be saved, it immediately made the decision…[not to refuse to loan additional capital], but instead to "liquidate the company"—thus forcing CompTech to close its doors two weeks later. The decision is thus arguably less like a subsidiary's independent choice to terminate its business in the face of severe cash constraints than like the decision of a WARN Act employer to close a single site of its operations.

*Id.* However, after describing CompTech's efforts in finding alternative financing, the Third Circuit concluded that CompTech was "an independent entity seeking further capital rather than as a branch of GECC operating under GECC's direction." *Id.* Finally, the court in *Pearson* noted that the distinction between calling a loan (or refusing further advances) and shutting down a company is a fine one, but the

~ 12 ~

facts weighed in favor of finding no "de facto control" by GECC. *Id.* at 504-05.

The Court finds the facts in *Pearson* analogous to the facts of this case; as a practical matter GECC exerted even more control in *Pearson* than Sun Cap is alleged to have done here. Similar to CompTech, these Debtors could not operate without funding from their parent, Sun Cap,[28] and were in fact considering filing for bankruptcy before Sun Cap's acquisition of the Debtor.[29] Just as in *Pearson*, Sun Cap installed two of its officers on the board of directors of Jevic Holding Corp.[30] Similarly, Sun Cap brought in Brian Cassady to provide financial, operational, and restructuring consulting services for the Debtors.[31]

Although the Debtors were under some oversight by Sun Cap, the Court finds the level of oversight to be significantly lower than in *Pearson* where GECC required approval of many CompTech decisions. More importantly, however, Sun Cap was not involved in the decision to terminate employees or shutdown facilities. The only reason that the court in *Pearson* was "given pause" was because GECC made the decision to liquidate the company, "thus forcing CompTech to close its doors two weeks later." *Pearson*, 247 F.3d at 504. Even still, the Third Circuit found no "de facto exercise of control" of the debtor by GECC.

Here, no Sun Cap personnel were involved in the day-to-day operations of the Debtors, including the hiring and firing of employees.[32] It is undisputed that no one affiliated with Sun Cap requested or directed that employees of Jevic be terminated.[33] Jevic had senior management discussions about whether to issue WARN Act

---

[28] It is undisputed that Sun Cap invested $1 million of its own cash to effectuate the acquisition of the Debtors and also guaranteed the Debtors' credit facility with CIT for up to $2 million. *See supra* Part I.

[29] *See* Def.'s App. 180, Paulson Dep. 72:2-7, Dec. 21, 2010 [Adv. Docket No. 184].

[30] *See supra* Part IV.C.2.

[31] Technically, Brian Cassady signed an agreement with Jevic, not Sun Cap. *See* Def.'s Supplemental App. 459-65 ("Agreement for the Provision of Consulting and Interim Officer Services" signed by Gorman on behalf of Jevic.) [Adv. Docket No. 210]. But it is undisputed that Cassady was very familiar with Sun Cap and its various entities, had worked on multiple projects in the past for Sun Cap, and was brought in by Sun Cap to help the Debtors. *See* Pls.' App. 823, Dooley Dep. 88:3-22, Aug. 21, 2012 [Adv. Docket No. 195].

[32] *See* Def.'s App. 110, Gorman Decl. ¶ 4-5 [Adv. Docket No. 184].

[33] *See* Def.'s App. 165-66, Neimark Dep. 138:20-139:3, Aug. 16, 2012.

notices where no Sun Cap employees were present, and Jevic management relied on its consultant from Morris Anderson for legal and bankruptcy advice.[34]

Class Plaintiffs argue that sharing in-house legal counsel is evidence of "de facto exercise of control" and allege that the Debtors and Sun Cap shared in-house counsel. While it is true that sharing in-house counsel was one fact that the court considered in *In re Tweeter Opco, LLC*, this allegation is not supported by the record. Class Plaintiffs direct the Court to deposition testimony by McElwee in regards to one email he sent to Sun Cap's general counsel. This email was in reference to the Debtors' CRO appointment, which was only sent because he could not find the people that worked on the agreement and he was not even sure if general counsel replied to his email.[35] This sole email is not the type of sharing of in-house counsel contemplated in *In re Tweeter Opco, LLC*. Thus, this does not materially affect the outcome.

Next, Class Plaintiffs argue that Defendant Sun Cap's decision to stop funding is actionable because it "assumed responsibility for the continuing viability of the company."[36] The Court disagrees. The Debtors retained the ultimate responsibility for keeping the company alive and therefore, Sun Cap did not incur WARN Act liability by refusing to make an additional investment. *Pearson*, 247 F.3d at 505. It is undisputed that the Debtors made the decision to shut down the company.[37] The WARN notice was signed by the Debtors, not Sun Cap, and it is not alleged that Sun Cap played a direct role in the employees' termination. Moreover, the Debtors sought capital and potential buyers on their own. The Debtors received independent

---

[34] *See* Def.'s App. 189-91, Paulson Dep. 93:14-95:2.
[35] *See* Pls.' App. 207-08, McElwee Dep. 105:23-106:23, Aug. 2, 2012.
[36] Pls.' Op. Br. 18 [Adv. Docket No. 194].
[37] Plaintiffs fail to cite any evidence showing that Sun Cap "specifically directed" the layoffs. In fact, Plaintiffs state that Marc Leder and Roger Krouse, Sun Cap's co-CEO's, "made the ultimate decision regarding any investment." Pl.'s Op. Br. 20. This implicitly indicates that Sun Cap did not make the decision to terminate employees, but rather only a decision to make an additional investment. By contrast, the court in *In re Tweeter Opco, LLC* found that SAM, the debtor's lender/parent, exercised de facto control over the debtor because it was directly involved with terminating employees of the debtor. S*ee* 453 B.R. at 545 (stating that Schultze, owner and managing director of SAM, ordered a SAM employee to terminate the debtor's employees on multiple occasions).

research into their financial options when they hired Morris Anderson and made Dooley their CRO, and they retained investment bank Stifel Nicolaus to seek potential buyers.[38] The Debtors met with two potential buyers and entered into negotiations, with one submitting a bid letter. Finally, the Debtors met with the NJEDA to seek additional capital in an attempt to stave off a bankruptcy filing. These steps, like the steps taken by CompTech in *Pearson*, reflect the Debtors' own decision-making and demonstrate that Defendant Sun Cap's decision to cut off funding was not a "de facto exercise of control" over the Debtors' decision to close its doors.[39] *See id.*

Class Plaintiffs draw a distinction between GECC's status as lender and Sun Cap's status as parent, seeming to hold a parent to a higher standard than a lender.[40] The Court declines to draw this distinction. The test for de facto control under the WARN Act is whether one company was the decision-maker for the employment practice that gave rise to the litigation. *See In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008). Although examining a parent corporation's role in the decision to terminate employees is important, *see Pearson*, 247 F.3d at 504 n.9 (stating that the very nature of WARN Act liability is "likely to result from decisions made from the highest levels within the corporate structure"), courts have not drawn a distinction between a parent or lender. In fact, the Third Circuit held that "because the lines separating 'parents' from 'lenders' are not often bright ones, the simpler approach is to apply the same test for liability regardless of the formal label the corporations have attached to their association." *Id.* at 478.

The Court finds no genuine dispute of material fact with respect to the DOL factor of "de facto exercise of control" and this factor weighs in favor of Defendant Sun Cap.

### 4. Unity of Personnel Policies

Class Plaintiffs allege that Defendant Sun Cap and the Debtors shared a healthcare initiative and incentive programs for management. Class Plaintiffs also allege that Jevic's CEO receiving a "best practices" kit from Sun Cap and Jevic's CFO attending a Sun Cap training

---

[38] *See supra* Part I.
[39] The Court also takes into consideration the policies of the WARN Act in its balancing of the five factors. *See Pearson*, 247 F.3d at 502 (stating that "[w]e do not intend to create a jurisprudence that discourages loans in general or rescues of troubled business enterprises in particular").
[40] *See* Pls.' Op. Br. 18-19.

research into their financial options when they hired Morris Anderson and made Dooley their CRO, and they retained investment bank Stifel Nicolaus to seek potential buyers.[38] The Debtors met with two potential buyers and entered into negotiations, with one submitting a bid letter. Finally, the Debtors met with the NJEDA to seek additional capital in an attempt to stave off a bankruptcy filing. These steps, like the steps taken by CompTech in *Pearson*, reflect the Debtors' own decision-making and demonstrate that Defendant Sun Cap's decision to cut off funding was not a "de facto exercise of control" over the Debtors' decision to close its doors.[39] *See id.*

Class Plaintiffs draw a distinction between GECC's status as lender and Sun Cap's status as parent, seeming to hold a parent to a higher standard than a lender.[40] The Court declines to draw this distinction. The test for de facto control under the WARN Act is whether one company was the decision-maker for the employment practice that gave rise to the litigation. *See In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008). Although examining a parent corporation's role in the decision to terminate employees is important, *see Pearson*, 247 F.3d at 504 n.9 (stating that the very nature of WARN Act liability is "likely to result from decisions made from the highest levels within the corporate structure"), courts have not drawn a distinction between a parent or lender. In fact, the Third Circuit held that "because the lines separating 'parents' from 'lenders' are not often bright ones, the simpler approach is to apply the same test for liability regardless of the formal label the corporations have attached to their association." *Id.* at 478.

The Court finds no genuine dispute of material fact with respect to the DOL factor of "de facto exercise of control" and this factor weighs in favor of Defendant Sun Cap.

### 4. Unity of Personnel Policies

Class Plaintiffs allege that Defendant Sun Cap and the Debtors shared a healthcare initiative and incentive programs for management. Class Plaintiffs also allege that Jevic's CEO receiving a "best practices" kit from Sun Cap and Jevic's CFO attending a Sun Cap training

---

[38] *See supra* Part I.
[39] The Court also takes into consideration the policies of the WARN Act in its balancing of the five factors. *See Pearson*, 247 F.3d at 502 (stating that "[w]e do not intend to create a jurisprudence that discourages loans in general or rescues of troubled business enterprises in particular").
[40] *See* Pls.' Op. Br. 18-19.

conference establish the unity of personnel policies factor. Defendant Sun Cap disputes that the Debtors joined its healthcare initiative or participated in its incentive program. Regardless, Sun Cap states that those two programs coupled with two isolated events—the CEO kit and CFO training—does not satisfy the standard laid out by the Third Circuit.

The test for the DOL's factor of "unity of personnel policies emanating from a common source" is "whether the companies actually functioned as a single entity with regard to its relationships with employees." *Pearson*, 247 F.3d at 499. To answer this question, courts consider "whether the two companies in question engaged in centralized hiring and firing, payment of wages, and personnel and benefits recordkeeping." *In re APA Transp. Corp.*, 541 F.3d at 245 (citation omitted).

The evidence that Class Plaintiffs put forth does not rise to the level of integrated personnel policies contemplated in this factor. First, Class Plaintiffs point to a one-day conference put on by Sun Cap that Jevic's CFO, Gerald Paulson, attended. But Class Plaintiffs can only point to this one instance of Sun Cap "training" the Debtors' employees.[41] Next, Class Plaintiffs state that David Gorman, Jevic's CEO, received Sun Cap's "CEO Process Toolkit," which contained its "best practices."[42] However, Gorman testified that he only opened it to page through it and Sun Cap did not make its use mandatory.[43] Third, Class Plaintiffs allege that the Debtors joined Sun Cap's healthcare initiative, but its citations to the record do not support this proposition.[44] Additionally, Class Plaintiffs state that Sun Cap

---

[41] *See* Pls.' Op. Br. 38 [Adv. Docket No. 194]. Jevic, not Sun Cap, had an Employee Handbook that established and governed training policies for Jevic employees that was in place before and used after Sun Cap's acquisition of the Debtors. *See* Def.'s App. 177-78, Paulson Dep. 51:21-52:8, Dec. 21, 2010 [Adv. Docket No. 184]. The Employee Handbook laid out in detail all of Jevic's employee policies including, employment practices, compensation, company benefits, assistance policies and programs, time away from work, personal development, the work environment, and termination. *See* Def.'s App. 210-57.
[42] *See* Pls.' Op. Br. 38.
[43] *See* Pls.' App. 1056-57, Gorman Dep. 106:14-107:8, Sept. 4, 2012 [Adv. Docket No. 195].
[44] The best that Plaintiffs can claim is that it "look[ed] like" the Debtors were ultimately going to participate in it. *See* Pls.' App. 1186-87, Paulson Dep. 166:17-167:4, Sept. 5, 2012. *But see* Def.'s App. 196-97, Paulson Dep. 96:24-97:24, Sept. 5, 2012 (testifying that the Debtors "stayed with United Healthcare

prepared budget plans for Jevic managers, which included headcount cuts in hopes of retaining additional liquidity from CIT. However, the record reflects that it was Gorman and his Jevic managers who prepared the cost-cutting plan for CIT.[45] Finally, Class Plaintiffs allege that Sun Cap entities shared incentive programs with the Debtors. The Third Circuit has held that evidence of sharing certain benefit plans and some employee monitoring functions is not enough to find that the two companies functioned as a single entity. *See In re APA Transp. Corp.*, 541 F.3d at 245. Thus, this allegation, taken as true, is not enough to show that Sun Cap was a "single employer" under the WARN Act.

The Court is satisfied, and the record reflects, that there is no unity of personnel policies between the Debtors and Defendant Sun Cap. *See Azzata v. Am. Bedding Indus., Inc. (In re Consol. Bedding, Inc.)*, 432 B.R. 115, 122 (Bankr. D. Del. 2010) (Where one company is an investment company and the other a mattress manufacturer, "it seems unlikely that Plaintiffs could ever demonstrate an integration of operations satisfying" this factor.); *Pearson*, 247 F.3d at 500 ("[T]he fact that GECC may have controlled the hiring and firing of the company's president and chief executive officer and monitored the hiring of a few other high-level managers…simply is not enough to find a 'unity' of personnel 'policy.'"); *In re Tweeter Opco, LLC*, 453 B.R. at 545 ("There is no evidence that SAM and the Debtor actually functioned as a single entity with respect to personnel policies on a *regular, day-to-day basis*.") (emphasis in original). Therefore, there is no genuine dispute of material fact and this factor weighs in favor of Defendant Sun Cap.

### 5. Dependency of Operations

Class Plaintiffs argue that the Debtors were dependent on the Defendant Sun Cap because Sun Cap officers were involved in the day-to-day decisions of the Debtors. Further, they allege that the Debtors were financially dependent on Sun Cap. Defendant Sun Cap responds that there was no dependency because Sun Cap continued to operate after the Debtors bankruptcy filing[46] and they maintained separate

---

through the end"); Def.'s Supplemental App. 434, Paulson Dep. 107:11-24, Sept. 5, 2012 (testifying that Jevic ultimately did not join Sun Cap's healthcare initiative) [Adv. Docket No. 210].

[45] *See* Pls.' App. 1061-62, Gorman Dep. 117:21-118:18, Sept. 4, 2012.

[46] The Court notes that this argument does not apply in this context. *See* Def.'s Ans. Br. 28 [Adv. Docket No. 212]. In the context of a parent private equity firm, it would not make sense for Sun Cap, an umbrella company, to fold when one of its many subsidiaries folds. The case cited by Sun Cap is clearly

books and records. Sun Cap also argues that its decision not to fund its subsidiary does not create a dependency of operations.

For the "dependency of operations" factor, the Third Circuit generally considers "the existence of arrangements such as the sharing of administrative or purchasing services, interchanges of employees or equipment, and commingled finances." *Pearson*, 247 F.3d at 500 (citations omitted). Control over day-to-day operations is indicative of interrelation of operations, but "the mere fact that the subsidiary's chain-of-command ultimately results in the top officers of the subsidiary reporting to the parent corporation does not establish the kind of day-to-day control necessary to establish an interrelation of operations." *Id.* at 501 (citations omitted); *see also In re Tweeter Opco, LLC*, 453 B.R. at 546 (holding that looking at the daily functioning of the two companies, there is no dependency of operations); *In re Consol. Bedding, Inc.*, 432 B.R. at 124 ("Although American Capital supervised much of the Debtors' activities and American Capital employees occupied seats on the Debtors' boards of directors, the Debtors at all times remained separate business entities that did not rely on American Capital for day-to-day operations."). Moreover, "dependency of operations cannot be established by the parent corporation's exercise of its ordinary powers of ownership." *Pearson*, 247 F.3d at 501. Likewise, "loans—even from a parent to a subsidiary—cannot be sufficient to satisfy this prong, particularly in this context where there is no serious dispute that GECC…[was] conducting a 'rescue' operation in an attempt to 'return Company to profitability.'" *Id.* at 503; *see also In re APA Transp. Corp.*, 541 F.3d at 245 ("Although the Employee Plaintiffs insist that the two companies commingled finances, the record indicates that the loans between APA Truck Leasing and APA Transport were made at arm's length."). Finally, the Third Circuit has made it clear that they "surely do not want to discourage companies from attempting to keep their subsidiary operations afloat with temporary loans by holding that the mere fact that loans were even necessary establishes a 'dependency of operations' giving rise to liability." *Pearson*, 247 F.3d at 503.

The record reflects that Sun Cap and the Debtors operated two distinct and separate businesses that were not dependent on each other.

---

distinguishable. *See In re APA Transp. Corp.*, 541 F.3d at 245 (finding that no dependency existed between APA Truck Leasing and APA Transport because APA Truck Leasing continued to operate without incident after the APA Transport folded). APA Transport was not a private equity firm.

It is undisputed that Jevic maintained separate books and records, had its own bank accounts, and prepared its own financial statements.[47] It is also undisputed that Jevic did not share administrative services, facilities, or equipment with Sun Cap.[48] Further, Sun Cap was explicitly an "independent contractor" under the Management Services Agreement to provide financial and management consulting services and was compensated for its work.[49] *See id.* at 502 (stating that Gaffney was hired, according to the terms of his contract, to run the company as he saw fit, and not in accordance with GECC directives). The agreement specifically stated that "[t]he activities of the [Debtors] shall at all times be subject to the control and direction of its directors and officers."[50] Additionally, there is no evidence that Sun Cap employees were involved in the day-to-day business operations of Jevic sufficient to show an existence of dependency. *See id.* at 501 (holding that the mere fact of reporting to the parent corporation does not establish day-to-day control of operations sufficient to show a dependency). Therefore, the Court finds that Sun Cap was not involved in the day-to-day business operations such that would warrant a finding of dependency.

The Class Plaintiffs' second argument—financial dependence—must also fail. The Third Circuit has held that a company independently seeking additional financing from an outside lender cuts against a finding of financial dependency. *See id.* at 502. The record reflects that the Debtors sought additional financing from the NJEDA and also sought out buyers, with one company submitting a bid letter.[51] These attempts by the Debtors to salvage the company cut against a finding of dependency. The Court also finds that Sun Cap's attempts to keep its subsidiary afloat by guaranteeing Jevic up to $2 million in the forbearance agreement with CIT does not create financial dependency;

---

[47] *See* Def.'s App. 120, Wolfe Decl. ¶ 17 [Adv. Docket No. 184].
[48] *Id.* ¶¶ 9-12.
[49] *See* Def.'s App. 265-72, Management Services Agreement ¶¶ 1-3. It also stated that "[n]othing in the agreement shall be deemed to constitute the parties hereto joint venturers, alter egos, partners…nor in any manner create any employer-employee or principal-agent relationship" between Sun Cap and Jevic. *Id.* ¶ 3.
[50] *Id.* ¶ 4; *see also* Def.'s App. 139, Gorman Dep. 115:2-4, Dec. 21, 2010 (stating that he, as President and CEO, had ultimate authority on all decisions concerning Jevic).
[51] *See supra* Part IV.C.3 (discussing the Debtors seeking potential buyers and capital).

neither is the initial investment by Sun Cap of $1 million. There is no evidence to support the allegation that these transactions were not in the ordinary course of business or not at arm's length.[52] *See id.* at 495 ("[T]he mere fact that a lender has loaned money to the borrower—thus making the borrower, in some sense, financially beholden to the lender—will not establish liability, or even 'dependency of operations'…."). It cannot be disputed that Sun Cap was attempting a "rescue" operation to return Jevic to profitability.[53] The Third Circuit has stated that "[w]e do not intend to create a jurisprudence that discourages loans in general or rescues of troubled business enterprises in particular." *Id.* at 502. Therefore, the Court finds that there is no genuine dispute of material fact that the Debtors were not dependent on Sun Cap.

## V. CONCLUSION

For the foregoing reasons, the Court finds that there is no genuine dispute of material fact that Sun Cap was not a "single employer" for purposes of the Class Plaintiffs' claims under the WARN Act and the New Jersey WARN Act. Therefore, Defendant's MSJ is **GRANTED** and Class Plaintiffs' Partial MSJ is **DENIED**. An appropriate Order follows.

**BY THE COURT**:

Dated: May 10, 2013
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge

---

[52] Simply because the Management Services Agreement was "set up before closing" does not mean that the agreement was not at arm's length as the Plaintiffs allege. *See* Pls. Br. 22 [Adv. Docket No. 194].

[53] "Sun Capital's focus is generally for troubled companies that they feel that they can turn around." Pls.' App. 30, Gross Dep. 16:8-10, July 12, 2012 [Adv. Docket No. 195]. Sun Cap "provided general consulting advice and acted as a sounding board and coach for Dave Gorman." Def.'s App. 128, Gillen Dep. 44:19-21, Dec. 16, 2010 [Adv. Docket No. 184].